J-A17032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CODY SIDERS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LORI CRITCHLOW, N/K/A LORI SPEECE | : | |
| | : | No. 175 WDA 2025 |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ELIZABETH MILLER | : | |

Appeal from the Order Entered January 21, 2025
In the Court of Common Pleas of Mercer County
Civil Division at 2023-00493

| | | |
|---|---|---|
| CODY SIDERS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LORI CRITCHLOW, N/K/A LORI SPEECE | : | |
| | : | No. 209 WDA 2025 |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ELIZABETH MILLER | : | |

Appeal from the Order Entered January 21, 2025
In the Court of Common Pleas of Mercer County

Civil Division at 2023-00493

BEFORE: McLAUGHLIN, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED: August 21, 2025**

In these consolidated appeals involving the custody of C.S. (Child), Lori Critchlow, n/k/a Lori Speece (Mother) appeals from the separate orders which granted the petition to intervene filed by Elizabeth Miller (Paternal Grandmother), and granted Mother's petition to relocate and modify custody.[1] After careful review, we affirm.

The trial court's "first order granted Paternal Grandmother intervenor status and the second order granted Mother's request to relocate and resolved all custody issues pending among the parties." Mother's Brief at 8. The court granted Mother permission to move to Ohio. Order (Custody Order), 1/21/25, at ¶ 4. The court provided for the parties' shared physical custody with Mother living in Ohio; alternatively, the court provided for shared physical custody if Mother decided to remain in Pennsylvania.[2] *Id.* at ¶¶ 5-11. Mother did not relocate. *See* Mother's Brief at 17.

_____

[1] The parties appeared *pro se* before the trial court, which noted it had given "latitude just so we can get to the point sometimes." N.T., 11/27/24, at 28. On appeal, Mother is represented by Northwestern Legal Services. Cody Siders (Father) and Paternal Grandmother continue to represent themselves and have not filed appellate briefs.

[2] The trial court also issued findings of fact (Findings of Fact) and conclusions of law (Conclusions of Law) which addressed the statutory custody factors set forth in 23 Pa.C.S. §§ 5328 (Factors to consider when awarding custody) and 5337 (Relocation). *See* Conclusions of Law at 3-13.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

Child was born in February 2023.  Child is two years old, yet "this case already has an extensive procedural history with multiple filings, including a dependency action brought by Mercer County Children and Youth Services[ (CYS)]."  Trial Court Opinion (TCO), 3/11/25, at 2.  "There have been open dependency cases in both Mercer County and Lawrence County[, and] Lawrence County [CYS] removed [C]hild for a period and placed him with Paternal Grandmother."[3]  Findings of Fact at 3.  The trial court has expressed "concerns for the safety of [C]hild."  *Id.*  However, the court also stated:

> We've had this [case] investigated [by CYS] a million times….  And [CYS] keeps [asking], why do you want to keep investigating[?] [Mother] seems to be doing a lot better.  They report the house is tidy.  No issues with drugs.  …  I sent [both parents] across the street [to drug test], [and both parents] passed last time.

N.T., 11/27/24, at 23.

Instantly, the trial court provided "a detailed recitation of the procedural history which it would normally condense," as "the large number of court appearances and filings in the matter [are] relevant to the appeal to demonstrate the litigious behavior of the parties."  TCO at 2.  "There have been multiple contempt and special relief petitions and hearings as well as multiple Protection From Abuse (PFA) matters."  *Id.*

The case began on March 1, 2023, when Father filed a complaint for custody and petition for emergency relief alleging unsafe conditions in

---

[3] Father lives in Lawrence County.  *See* N.T., 8/9/24, at 3.

Mother's home. Following a hearing, the trial court ordered that the parties share custody "week to week," and directed that they "minimize the amount of time spent with others." Order, 3/7/23. In the three months that followed, the court decided multiple petitions, filed by both parties, for contempt, emergency relief, and PFA orders. **See** TCO at 2-4.

In July 2023, Child came into the care of Lawrence County CYS.[4] **Id.** at 4. Child was adjudicated dependent on August 3, 2023, and placed with Paternal Grandmother. **Id.** On January 5, 2024, the trial court terminated the dependency case at the recommendation of CYS. **Id.** at 5. The court explained:

> On January 5, 2024, this [c]ourt entered an [o]rder: appointing a [g]uardian [a]d [l]item ("GAL"), granting the parties shared legal custody with [Father] having partial physical custody supervised by … Paternal Grandmother, establishing custody schedules, and scheduling a conciliation. Following a review conference, on June 20, 2024, this [c]ourt entered an [o]rder temporarily suspending [Father's] prior partial custody rights and granting [Father] supervised partial custody…, and ordering [Father] to undergo a mental health evaluation.
>
> On June 24, 2024, [Father] filed a [p]etition for [e]mergency [r]elief against [Mother,] alleging [she] was refusing to give [Child] medication as prescribed, [Child] was covered in feces upon [Father's] receipt of [C]hild, [Mother's] neighbors' house was involved in a drive-by shooting, [Mother] was facing new criminal charges for [d]riving without a [l]icense (yet still continues to drive around with minor children in the car), and

---

[4] Child was in Father's custody from June 10-21, 2023, and Mother, "upon retrieving [Child,] … observed multiple abrasions and contusions to his body," which prompted her to take Child to the hospital, "where medical professionals allegedly determined neglect and abuse had occurred," and "reported the matter to the appropriate authorities, prompting an investigation." **Id.** at 4.

[Mother] abused controlled substances in the presence of [Child] and another minor child.

*Id.*

Also on June 24, 2024, Mother filed a notice of proposed relocation seeking to move to Marysville, Ohio. *Id.* Mother indicated that she planned to relocate with Child, as well as her two daughters, who were 17 and 3 years old at the time.[5] Notice of Proposed Relocation, 6/24/24, at 1. On June 26, 2024, the trial court ordered that a hearing be held on July 10, 2024, to address Father's petition for emergency relief and Mother's proposed relocation. Order, 6/26/24. The trial court convened the hearing on July 10, 2024. However, as both parents had accused the other of drug use, the court recessed the hearing for Mother and Father "to go across the street and take a drug test." N.T., 7/10/24, at 7. After Mother's "drug test failure and exit without informing the [c]ourt," the court granted Father "primary physical custody subject to partial custody of [Mother]."[6] TCO at 5.

Less than a week later, on July 16, 2024,

[Mother] filed a [p]etition for [e]mergency [r]elief against [Father] asserting: CYS found [Father's] residence was not livable for [Child] or other minor children, [Child] is in the care of [Paternal Grandmother] (not [Father]), and neither [Father] nor [Paternal Grandmother] will communicate with [Mother] or the GAL. On July 26, 2024, [Father] filed a [p]etition for [c]ivil [c]ontempt[,] alleging [Mother] violated the existing custody terms by posting

---

[5] Mother also has an adult son; her four children have different fathers. *See* N.T., 11/27/24, at 44.

[6] The GAL subsequently reported that Mother tested positive for amphetamines. GAL Report (August Report), 8/9/24, at 1.

on social media about the case and allowing her spouse to be around [Child].

*Id.* at 6.

The GAL filed a report on July 18, 2024 (July Report), which, *inter alia*, relayed that Mother denied using illegal drugs and claimed she tested positive for amphetamines due to "other prescriptions and weight loss supplements" she was taking. July Report at 2. The GAL noted that Mother had "not provided direct evidence of that possibility." *Id.* The GAL recommended Mother "undergo a [drug and alcohol] evaluation, and commence any treatment," and stated that Mother's "numerous calls to [the GAL] illustrate that she needs to be in mental health treatment as well." *Id.* With respect to Father, the GAL reported that Lawrence County CYS had placed Child (and the three children of Father's partner) "on a safety plan" with Paternal Grandmother. *Id.* at 2. The GAL explained that the safety plan was the result of Father's home having exposed electric wiring, and lacking food, diapers and clothing for Child. *Id.* On July 18, 2024, the trial court scheduled a hearing for August 9, 2024.

At the August 9, 2024 hearing, Father testified that his home had been repaired and CYS "cleared" it. N.T., 8/9/24, at 2, 15. Father's drug test "failed for alcohol," which he attributed to "having a couple with the guys after work." *Id.* at 2. Mother passed her drug test and testified that she had moved into a new apartment. *Id.*

The GAL presented his August Report, which he described as "the latest chapter of a particularly contentious and extenuated battle between the parents." August Report at 1. The GAL stated:

At the last court appearance [on July 10, 2024], Mother did not pass a drug test, but it should be noted that the substance was amphetamines, not as originally believed[,] illegal methamphetamines. [As] Mother left [c]ourt prior to completion of the hearing, [and] … Father [had] not attend[ed a court-ordered] conciliation conference[, C]hild was turned over to [F]ather with the assistance of [Mercer County] CYS and the Sharon Police Department. It is important to note that there were no injuries or suspicious areas noted on [C]hild at that time. The [c]ourt granted contact between Mother and Child…, but to date, such contact has not taken place. A couple of those scheduled visits were cancelled by [F]ather, claiming that he feared for his safety [because] Mother [and another man, presumably her] boyfriend[, had] threatened … his life.

*Id.*

The GAL reported that Mother completed a drug and alcohol assessment, which did not recommend treatment. *Id.* at 2. However, the GAL "continue[d] to maintain that she needs to be involved in mental health treatment." *Id.* The GAL confirmed that Lawrence County CYS verified Father's progress "in cleaning up and fixing the house, and indeed all children were returned to Father's home [on] July 26, 2024." *Id.* The GAL emphasized Mother and Father's "gamesmanship," and concluded they were "too fully engulfed in their hatred for one another to work together in [Child's] best interests." *Id.* The GAL advised that his recommendations were in the August Report. N.T., 8/9/24, at 3. His first recommendation was that the court appoint a parenting coordinator. The GAL verbally requested, "[O]nce again,

[that Mother and Father] leave [C]hild … out of the internet." **Id.** He also recommended that custodial exchanges occur "at a police department that is fully staffed [so] someone will be there." **Id.** at 4.

The trial court questioned Mother and Father about Child's health and their preferences for days and times to exchange custody. **Id.** at 6-12. The court stated that it would appoint a parenting coordinator and schedule a hearing to address Mother's relocation request. **Id.** at 12-13. In addition, the court advised Mother to call witnesses and "have anybody that's going to be living with you testify." **Id.** at 14-15. The court also encouraged Mother to provide pictures of where she planned to live. **Id.** at 15. In the interim, the court entered an order providing for Mother and Father's shared legal and physical custody, with "schedules and rules about communication." TCO at 6. The court also appointed a parenting coordinator. Order, 8/9/24, at 2.

On August 13, 2024, Father filed a petition for civil contempt alleging that Mother failed to appear at a custody exchange and continued to post on social media about the case. On August 29, 2024, Father filed a petition for emergency relief, followed by a petition for civil contempt on August 30, 2024, alleging that Mother had moved without the court's permission. On September 9, 2024, Father filed a counter-affidavit objecting to Mother's relocation and modification of custody.

The court held a hearing on September 30, 2024, and entered an order holding Mother "in contempt (with no sanctions), reiterating [that Child was] not permitted to be around [Mother's] spouse, permitting [Father's] spouse

to be around [Child], and otherwise resuming the previous custody terms." TCO at 6. The court noted that a hearing was scheduled for October 9, 2024, to address Mother's relocation request. Order, 9/30/24, at 2.

On October 9, 2024, Mother appeared for the hearing without evidence or witnesses. The trial court continued the hearing to "get everyone else here." N.T., 10/9/24, at 4. The court entered the following order:

> [M]other not having the evidence that she requested to present, IT IS HEREBY ORDERED this matter is continued to Wednesday, November 27th, 2024….
>
> … Mother has been told what evidence she needs to produce, including the relocation factors.

Order, 10/9/24.

On October 11, 2024, Paternal Grandmother filed a petition to intervene. On October 15, 2024, the trial court entered an order stating that the November 27, 2024 hearing would also serve "the purpose of determining whether the Petitioner(s) may intervene in this custody action." Order, 10/15/24.

On November 27, 2024, five witnesses appeared: Mother; Father; Paternal Grandmother; Mother's mother, Tonya Williams (Ms. Williams); and Paternal Grandmother's husband, Gregory Miller (Paternal Grandfather). The GAL and the parent coordinator were also present. At the outset of the hearing, the trial court stated, "We're here on two things." N.T., 11/27/24, at 3. The court specified that the two issues were Mother's relocation request and Father's "mom's [m]otion to [i]ntervene." *Id.*

Mother testified that she wished to move with Child to her mother's home in Ohio. Mother brought pictures of the home which the trial court accepted into evidence as Exhibit 1. *Id.* at 3-4. Mother described the neighborhood as "high class" and having a good school district. *Id.* at 7. She stated it would be "just me and my mom and the kids."[7] *Id.* at 4. Mother expressed her desire to "be closer to family and have the support of my family, because I don't have anybody over here." *Id.* at 6. She testified that she had a job offer at a convenience store where her mother works, and had submitted another job application that was pending. *Id.* at 5-6. Mother added that she would not need professional childcare because she had family members, including her sister, who were willing to watch Child. *Id.* at 6.

Mother testified that her mother's home was 3 hours and 37 minutes away. *Id.* at 7. She stated that she had her license and a car, and would be willing to transport Child. *Id.* at 7, 32. Mother reiterated that she sought relocation for "bigger support." *Id.* at 7.

Mother's mother, Ms. Williams, testified that she lived by herself in the house depicted in the photos introduced by Mother. *Id.* at 9. She stated that she has three other daughters and numerous grandchildren who live nearby. *Id.* at 11-12. Ms. Williams testified that she works as a manager at a convenience store and has a second job at a pizza shop, but would be willing to help transport Child between Ohio and Pennsylvania. *Id.* at 9, 12. She

---

[7] Mother confirmed that she sought to relocate with Child and her two daughters, who were 17 and 4 years old at that time. *Id.* at 44-45.

confirmed that in Ohio, Mother has "family, has sisters, has me to help her." *Id.* at 13. Ms. Williams opined that "a child should have a bond with his mother," and Child "hasn't been solid with [M]other since he was three weeks, two weeks old." *Id.* at 14.

Paternal Grandmother testified next. She stated that she lives with Paternal Grandfather, as well as her 19-year-old daughter and 8-year-old son. *Id.* at 17. Paternal Grandmother works part-time as an office assistant, and Paternal Grandfather works as a truck driver and at a food co-op. *Id.* at 18. Paternal Grandmother described her relationship with Child:

> We have a good relationship; [Child] and I and my husband and my daughter and my [younger] son. Actually, [Child] came to live with me and my husband and family for five months through CYS. We're very close. He gets very excited when he sees me and my husband and the kids.

*Id.* at 19.

Paternal Grandmother explained, "now we see [Child] anywhere from like twice a week. We'll get him Wednesday and Thursday on my days off." *Id.* In response to the trial court's questions, she testified that Father continued to live with his partner and her children, and had been taking good care of Child. *Id.* at 20. Paternal Grandmother stated that Child is excited when Father "walks in the door and … runs over to him and will hug him." *Id.*

Regarding Mother's proposed relocation, Paternal Grandmother noted her concern with "issues about transportation and getting [Child] here." *Id.* at 21. The trial court asked:

THE COURT: Let's talk a little bit about that. Because now [Mother] has her license back. …

Can you cooperate with her to get a better exchange? Because these two [parents] have generally shown that they can't. Can you get along with her well enough to exchange?

[PATERNAL GRANDMOTHER]: And we do. I mean, … when we did the CYS visits, I was the one doing the CYS visit exchanges. And I do … exchanges when [Father] and [his partner] can't do it. I do the exchanges or pick-ups.

*Id.* at 21-22.

Father testified that he works Tuesday through Friday, every other weekend, and is off every Monday. *Id.* at 25. When Father is working, either his partner, Paternal Grandmother, Paternal Grandfather, or Father's sister watch Child. *Id.* at 26.

The GAL stated his "concern since the last order[,] that I have been involved, unfortunately, on too many Saturdays because the exchanges weren't taking place on time. They were volatile." *Id.* He also stressed the importance for Child "at this age" to have "frequency of [parental] contact for bonding to occur." *Id.* at 26-27. The GAL stated that with Child possibly "being moved so far away, that doesn't leave the [c]ourt a whole lot of options as far as [frequent] contact is concerned unless it's done by something like Zoom, which … is not ideal." *Id.* at 27. The GAL noted that despite his repeated requests, Mother had provided few details about where she would be living. He stated, "I'm really not in a position at this time to say this a wonderful idea [for Child]. Conversely, I think this is a wonderful idea for [Mother]." *Id.*

Similarly, the parenting coordinator stated that she "had been trying to work with [Mother and Father] to check in with them and address any issues." *Id.* at 30. She relayed that Father "pretty much calls me weekly and gives me updates," but Mother "is not consistent with calling me." *Id.* The parenting coordinator explained to both parents that she "can't do anything *ex parte*," and told the trial court that she did not have a recommendation due to the lack of adequate communication. *Id.* at 30-31.

The trial court advised that it would "go through [the statutory custody] factors" before deciding Mother's request to relocate. *Id.* at 29. The court noted it had "to consider what's in the best interest of [Child]. And part of that decision is what's in the best interest for [Mother] so [she] can [best] take care of" Child. *Id.* at 29-30.

Regarding Paternal Grandmother's petition to intervene, the trial court asked Mother and Father if they "understood what it means to intervene?" *Id.* at 33. When Mother said that she did not, the court explained that an intervenor is "considered a party." *Id.* The court continued:

> In certain circumstances, grandparents are allowed to petition to intervene. [Paternal Grandmother] can petition to get her own custody.
>
> I believe in this case she would be qualified, but we have to go through a hearing if you [two] don't consent.
>
> I know [Father will] consent. Will you consent? And basically what you're doing is what we call allow standing to pursue custody.
>
> [GAL], feel free to [provide input].

- 13 -

Only certain people can sue for custody of a child. When I started in this business only the parents could. Then the Legislature expanded it to grandparents. But only in certain circumstances can grandparents pursue it.

In this case I believe [Paternal Grandmother] would qualify based on the prior relationship with [Mother and Father] and her and the CYS situation where she was actually granted— [*sic*]

When a child is in placement with CYS, CYS actually has custody. But I believe if we go through a factual hearing, I'm going to be able to grant standing to [Paternal Grandmother].

[GAL], do you agree?

*Id.* at 33-34.

The GAL replied:

I do agree, Judge. And actually both Lawrence County and Mercer County have used [Paternal Grandmother f]or placement, Your Honor. First, when Mercer County became involved, and then later with Lawrence County there was an agreement that children had to be removed from [Father's] house until it was … cleaned up and fixed. So once again, there are two different departments that have seen that [Paternal Grandmother] is an appropriate caregiver for [C]hild.

*Id.* at 34.

The trial court addressed Paternal Grandmother:

THE COURT: You filed a petition to intervene. Do you know what that means?

[PATERNAL GRANDMOTHER]: Yes.

[THE COURT]: Explain to me what you think it means.

[PATERNAL GRANDMOTHER]: That … [Child] would come stay with us.

[THE COURT]: Well, sort of.

[PATERNAL GRANDMOTHER]: But [Mother and Father] would still get visits.

[THE COURT]: Is that what you want?

[PATERNAL GRANDMOTHER]: Yes. We love [Child] very much.

[THE COURT]: So if you had your way, what would happen?

[PATERNAL GRANDMOTHER]: If I had my way, [Child] would come live with us. He deserves so much more than what he's getting right now. And me and my husband are able to provide that for him.

[THE COURT]: Let's go over a few things.

[PATERNAL GRANDMOTHER]: Okay.

[THE COURT]: When have you had [Child] at your house [and been] his primary caregiver?

[PATERNAL GRANDMOTHER]: As primary caregiver, when Mercer County was involved and they placed him in my care for kinship care.

[THE COURT]: Do you know when that was?

[PATERNAL GRANDMOTHER]: … July of 2023 to December of 2023.

[THE COURT]: And then at some point [a judge] in Lawrence County did the same thing?

[PATERNAL GRANDMOTHER]: Well, it was Lawrence County CYS that placed [Child] with me. He was roughly with me for about a week, a week and a half. … They just called me and asked if I could keep him until [Father] got his house repaired.

[THE COURT]: … If [Child] would come to your house, what would the living arrangements be?

[PATERNAL GRANDMOTHER]: We have a bed for him [and] a pack and play for him at the house. … [Child] would stay in our room until my daughter[, who] is planning to move out, she's 19, [and] at that time we would switch everything around and he would have his own room.

*Id.* at 35-36.

The trial court asked Mother and Father if they wanted to question Paternal Grandmother. Father declined, while Mother asked:

> [MOTHER]: If it does go through with the intervening, do you have a custody schedule in mind for visitation?
>
> [PATERNAL GRANDMOTHER]: That's something we would have to work out.
>
> [THE COURT]: Off the top of your head, what do you think?
>
> [PATERNAL GRANDMOTHER]: Well, I don't know how [Mother's] schedule is now that she's started working, and being three and a half, four hours away.
>
> Honestly, I haven't really thought about it because I didn't know how things were going to go today.
>
> [THE COURT]: Okay. Any other questions for [Paternal Grandmother]?
>
> [MOTHER]: No.

*Id.* at 37.

Paternal Grandfather also testified. The trial court noted Paternal Grandfather had been present throughout the hearing and asked if he disagreed with anything he had heard. Paternal Grandfather answered that he did not. *Id.* at 38. The court stated that it considered Paternal Grandmother's request to intervene "as both a request to intervene but also a request for custody," and asked Paternal Grandfather, "his position on that?" *Id.* Paternal Grandfather said he "was all for custody of [Child]." *Id.* He added:

> Your Honor, … you can just tell when [Child is] at our house he's in a better place. He's relaxed. … [H]e's seen too much yelling and stuff. … At our house he gets to do what he wants to do and he's going to be raised in a good home.

- 16 -

*Id.* at 38-39.

As to parents, Paternal Grandfather stated that he gets along with Father, although "he upsets me sometimes." *Id.* at 40. Paternal Grandfather indicated that the custody dispute is frustrating, but added that he was "looking out for what's best for [Child]." *Id.* He also stated that he "was fine with [Mother and n]ever had an issue with [Mother]." *Id.* When the trial court asked Mother and Father if they had questions for Paternal Grandfather, they both replied that they did not.

The trial court asked if there was "anything else anybody wants to present?" *Id.* at 41. The GAL responded that he had been to Paternal Grandmother's home, and stated: "It's clean. It's appropriate. They have space. I didn't note any concerns." *Id.* No one else responded.

The trial court continued:

> Now what we have is argument. We kind of had two different hearings. Once again, you don't have attorneys. But is there anything else you want to argue? What do you want to see happen if you could wave a magic wand? … What do you want to see happen?

*Id.*

Father replied he was "fully behind" Paternal Grandmother being granted permission to intervene, and "fully behind" Mother "going to Ohio to help better herself. I just don't think that it's best or safe for [Child]." *Id.* at 42.

Mother replied that "the best thing would be for me to relocate with [Child] to Ohio so I can better my life and his life." *Id.* at 41. She added:

> I'm not completely taking [Child] to Ohio and abandoning [*sic*] them completely from him. If we can work out some kind of visitation schedule, if I'm able to drive down.
>
> ***
>
> I would be more open, like even if it was a visitation we did every other weekend. Or if they wanted to come get him or meet me halfway to get him. **She** could have him for a week or so. I would be more willing to do that with **her** and communicate directly with **her**….
>
> ***
>
> [M]oving to Ohio would benefit me and my kids tremendously. The extended family, better job opportunities, [Child] has cousins he's never met before, family he's never met before. And I'd be more than willing to communicate with [Paternal Grandmother] **if she wants him for a week or anything like that**. I'd be more than willing to communicate with her so [Child] still sees **them**.

*Id.* at 42-43, 47 (emphasis added).

Notably, the trial court commented:

> If [Mother and Father] knew how to work it out, we wouldn't be here. [They] can't work it out. So that's why I'm asking specifically, … what exactly would you anticipate the schedule to be?
>
> [T]his is not fun for me. And it's especially not fun because now I'm old enough that I've seen some of the damage done to kids when they get to be teenagers and young adults. If you [parents] can't figure it out, you're … affecting not just [Child], but the other siblings and their ability to have healthy adult relationships. … I've seen it personally. The animosity that you two have is palpable in the room here. Now, you're doing much better than you have in the past. [Child] probably senses it every time [there is a custody] exchange, [and] I would like to have [the] exchange where you [two] don't have to see each another [*sic*] and we have third parties do it. … I would like to see you [two] figure it out.

But you can't and that's why we have courts[, although c]ourts are designed to try criminal cases or civil cases, not figure out how to raise kids. …

So that's why I'm asking … what exactly you see … in terms of what we call partial physical custody?

*Id.* at 48-49.

Mother repeated her request to relocate with Child and share physical custody every other weekend. *Id.* at 49-50. When the trial court mentioned pending PFA petitions, Mother stated she "would be more than happy to meet [Paternal Grandmother] for custodial exchanges." *Id.* at 50. She also stated that if she was not permitted to relocate, she "would still do one week on, one week off[,] with the exchanges done by [Paternal Grandmother]." *Id.* at 51. Father requested that custody "go back to how it's been, week on/week off." *Id.* at 50.

The trial court advised that it would take time to consider its decisions. While the decisions were pending:

On January 15, 2025, [Mother] filed a PFA [p]etition and [p]etition for [e]mergency [r]elief against [Father], alleging [that Mother], upon retrieving [Child] at the Hermitage Police Department, was informed by Paternal Grandmother that [C]hild was covered in bruises on his stomach and arms. [Mother] further alleged that [Child] had been in [Father's] care from January 4, 2025, to January 11, 2025. During said time, [Father] was allegedly in a relationship with a new girlfriend who harbored animosity toward [Child]. On January 7, 2025, [Father's] girlfriend was allegedly criminally charged with simple assault, recklessly endangering another person, and harassment arising from an incident in which she allegedly brandished a firearm at her ex-boyfriend while a five-year-old child was present in the vehicle. [Mother] further alleged [Father] was in possession of the girlfriend's firearm despite [Father] being on probation. A [t]emporary PFA [o]rder was granted by th[e c]ourt.

- 19 -

J-A17032-25

TCO at 7.

On January 21, 2025, the trial court issued the order granting Paternal

Grandmother's petition to intervene, and the Custody Order with Findings of

Fact and Conclusions of Law. The court permitted Mother to relocate, and

ordered that "[Mother] and Paternal Grandmother shall share the physical

custody of Child." Custody Order at ¶ 5. The court awarded Father "partial

physical custody, supervised by Paternal Grandmother during her periods of

physical custody." *Id.* at ¶ 9. Specifically, the court directed:

> If Mother moves …,
>
>> Paternal Grandmother shall have Sunday evening at 5:00
>> p.m. until Friday evening at 7:00 p.m. Mother shall have 3
>> weekends per month from Friday evening at 5:00 p.m. until
>> Sunday evening at 5:00 p.m. Mother shall pick the 3
>> weekends and notify Paternal Grandmother of the chosen
>> weekends….
>
> If Mother does not relocate, Paternal Grandmother and Mother
> shall share custody of [C]hild on a week-to-week basis.

Custody Order at ¶¶ 5-7.[8]

On February 4, 2025, counsel from Northwestern Legal Services entered

her appearance on behalf of Mother, and filed a motion for reconsideration of

the order granting Paternal Grandmother's petition to intervene. The trial

---

[8] The court also "removed the GAL" and ordered that Mother's outstanding
petition for emergency relief was moot. TCO at 7. At Docket No. 2025-0096,
the court entered an amended temporary PFA order against Father through
January 31, 2026. The PFA order "protects [Child]," but provides for custody
"as set forth in the Custody Order." *Id.* at 8.

court denied the motion without a hearing. On February 11, 2025, Mother filed notices of appeal from both orders, along with concise statements pursuant to Pa.R.A.P. 1925(a)(2)(i).

On March 7, 2025, this Court ordered Mother, at both appeal dockets, to show cause as to the finality or appealability of both orders. In response, Mother averred that the Custody Order was final and appealable because it disposed "of all claims the parties brought before the [t]rial [c]ourt after a full evidentiary hearing." Response (No. 175 WDA 2025), 3/18/25, at 7 (unnumbered). Mother stated that she "decided not to relocate," and her "decision not to relocate effectively ends the litigation." *Id.* at 6. Regarding the order permitting Paternal Grandmother to intervene, Mother referenced the "complete resolution of the custody claims pending among the parties." Response (No. 209 WDA 2025), 3/18/25, at 6. She stated that the parties "did not contemplate future proceedings on those custody claims because [Mother] did not relocate." *Id.* On March 25, 2025, this Court discharged the show cause orders, deferred disposition of the merits, and consolidated the appeals *sua sponte*.

ISSUES

Mother presents the following nine issues for review:

A. Are the [t]rial [c]ourt's January 21, 2025 [o]rders final orders?

B. Did the [t]rial [c]ourt misapply the law by failing to establish Paternal Grandmother's standing to intervene prior to exercising jurisdiction over Paternal Grandmother's case in violation of 23 Pa.C.S. § 5324 because standing is a fundamental element of

justiciability which is required prior to adjudicating a cause of action?

C. Did the [t]rial [c]ourt misapply the law by failing to delineate how Paternal Grandmother established standing and by failing to include those findings of fact or conclusions of law in its order granting intervenor status?

D. Did the [t]rial [c]ourt misapply the law by concluding that Paternal Grandmother likely had standing because of a prior adjudication of dependency in violation of established case law that holds that standing in child custody is based on the facts as they exist at the time that the issue of standing is decided?

E. Did the [t]rial [c]ourt misapply the law by granting Paternal Grandmother permission to intervene when Paternal Grandmother failed to plead facts or assert a legal basis to support the relief requested pursuant to 23 Pa.C.S. § 5324 in violation of Pa.R.Civ.P. 1915.3(e)?

F. Did the [t]rial [c]ourt misapply the law by failing to analyze the custody factors as updated by the passage of Kayden's Law in violation of 23 Pa.C.S. § 5328?

G. Did the [t]rial [c]ourt misapply the law by failing to conduct a weighted analysis of the custody factors because the custody dispute was between biological parents and a third party where the burden of proof is not evenly balanced and the evidentiary scale is tipped hard to the biological parents' side?

H. Did the [t]rial [c]ourt misapply the law and abuse its discretion by:

i. Granting Father a hearing on his objection to Mother's proposed relocation when Father failed to timely object in violation of 23 Pa.C.S. § 5337?

ii. Including Paternal Grandmother, as a party to the custody action, in its relocation analysis when Mother had petitioned for relocation approximately four months prior to Paternal Grandmother filing the petition to intervene in the custody action?

I. Did the [t]rial [c]ourt abuse its discretion by exercising discretion in a manner lacking reason because the [t]rial [c]ourt's [F]indings of [F]act, analysis of the custody factors and analysis

of relocation factors are based on allegations and assumptions that have no evidentiary support in the record?

Mother's Brief at 4-5.

## DISCUSSION

Mother's nine issues involve three matters: 1) the appealability of the January 21, 2025 orders; 2) Paternal Grandmother's standing to intervene; and 3) the trial court's analysis of statutory custody factors.

*1. Appealability of the January 21, 2025 Orders*

The record supports Mother's assertion that the January 21, 2025 orders are final or appealable. A final order "disposes of all claims and of all parties." Pa.R.A.P. 341(b)(1). A custody order is final and appealable when it is entered after the trial court has completed its hearings on the merits, and the court intends the order to constitute a complete resolution of the parties' claims. **K.D. v. E.D.**, 267 A.3d 1215, 1222 (Pa. Super. 2021). As the trial court disposed of the parties' underlying claims, we consider Mother's issues regarding Paternal Grandmother's standing and the trial court's custody analysis.

*2. Paternal Grandmother's Standing to Intervene*

Mother argues the trial court erred by finding Paternal Grandmother had standing to intervene. The issue of standing presents a legal question; therefore, our standard of review is *de novo* and our scope of review is plenary. **M.L.S. v. T.H.-S.**, 195 A.3d 265, 267 (Pa. Super. 2018).

Standing is a threshold issue which must be resolved before reaching the merits of a custody matter. *C.G. v. J.H.*, 193 A.3d 891, 898 (Pa. 2018). The concept of standing ensures that a party seeking to litigate a matter has a substantial, direct, and immediate interest in the subject of the litigation. *Id.* Standing may exist "where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent." *S.A. v. C.G.R.*, 856 A.2d 1248, 1250 (Pa. Super. 2004) (citation omitted).

Mother claims the trial court failed to properly analyze 23 Pa.C.S. § 5324(2)-(3) regarding a non-parent's standing to seek custody. *See* Mother's Brief at 9, 19-27. Section 5324(2) permits a person to pursue custody if they stand *in loco parentis* to a child.[9] 23 Pa.C.S. § 5324(2). Section 5324(3) permits a custody action by a grandparent who is not *in loco* parentis, but:

> (i) whose relationship with the child began either with the consent of a parent of the child or under a court order;
>
> (ii) who assumes or is willing to assume responsibility for the child; and
>
> (iii) when one of the following conditions is met:
>
>> (A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);

---

[9] "The term *in loco parentis* literally means in the place of a parent. There are two components to *in loco parentis* standing: (1) the assumption of parental status and (2) the discharge of parental duties." *M.L.S.*, 195 A.3d at 267.

(B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or

(C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

23 Pa.C.S. § 5324(3).

This Court has found that a person without any familial relationship had standing in a custody action, where the person "not only acted *in loco parentis*, but also was previously awarded primary custody." ***Tracey L. v. Mattye F.***, 666 A.2d 734, 735 (Pa. Super. 1995). We stated:

The question still is, What is in the child's best interest? However, the parties do not start out even; the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first hear all evidence relevant to the child's best interest, and then decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*Id.* (citation omitted).

Here, the trial court concluded Paternal Grandmother had "standing to intervene and to be awarded custody and the record as outlined … demonstrates the same." TCO at 9. However, the court also found that Mother never objected to Paternal Grandmother's standing, and her failure to do so constitutes waiver. *Id.* at 8. We agree.

- 25 -

Mother maintains she objected to Paternal Grandmother's petition to intervene, but does not identify any objection, and implies she objected because she "did not consent to Paternal Grandmother's intervention and the [t]rial [c]ourt conducted a hearing." Mother's Brief at 10, 22. She concedes that "a failure to timely object can constitute waiver," but asserts that the trial court "was required to establish standing prior to having jurisdiction over Paternal Grandmother's case." *Id.* at 21. Mother states that "a lack of jurisdiction cannot be waived." *Id.* This argument is not persuasive.

Pennsylvania courts view the issue of standing as non-jurisdictional and waivable. *Est. of A.J.M.*, 308 A.3d 844, 851 (Pa. Super. 2024). "Whether a party has standing to maintain an action is not a jurisdictional question. Thus, an issue relating to standing is waivable." *Grimm v. Grimm*, 149 A.3d 77, 83 (Pa. Super. 2016) (citations omitted); Pa.R.A.P 302(a) (issues not raised in the trial court are waived and cannot be raised for the first time on appeal).

As illustrated above, Mother did not object to Paternal Grandmother's petition to intervene prior to or during the custody proceedings. She did not file a responsive pleading, and despite multiple opportunities, she did not verbalize any objection. To the contrary, Mother's comments and testimony suggested that she agreed with Paternal Grandmother being a party to the custody action. Mother did not express opposition to Paternal Grandmother's standing until after the order was entered and she obtained counsel who filed an unsuccessful motion for reconsideration. Under these circumstances, we agree that Mother waived the issue of Paternal Grandmother's standing.

- 26 -

*3. The Trial Court's Analysis of Statutory Custody Factors*

Mother also challenges the trial court's Custody Order. She claims the court erred in weighing the statutory custody factors, disregarding "the passage of Kayden's Law in violation of 23 Pa.C.S. § 5328,"[10] and basing its decision on "allegations and assumptions that have no evidentiary support in the record." *See* Mother's Brief at 38-53.

We review a custody order for an abuse of discretion. *Rogowski v. Kirven*, 291 A.3d 50, 60 (Pa. Super. 2023). It is not this Court's function to determine whether the trial court reached the "right" decision; rather, we consider whether, based on the evidence, with due deference to the trial court's weight and credibility determinations, the trial court erred or abused its discretion. *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005). Notably:

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*B.S.G. v. D.M.C.*, 255 A.3d 528, 533 (Pa. Super. 2021) (citations omitted).

The primary concern in any custody case is the best interests of the child. *Id.* The best-interests standard, decided on a case-by-case basis,

---

[10] Effective August 2024, Kayden's Law amended section 5328(a)(8) to require "'substantial weighted consideration' to, *inter alia*, the 'safety of the child,' which is defined in Kayden's Law as including 'the physical, emotional and psychological well-being of the child,' and any '[v]iolent or assaultive behavior committed by a party.'" *Velasquez v. Miranda*, 321 A.3d 876, 886 (Pa. 2024) (citation omitted).

involves all factors that legitimately affect the child's physical, intellectual, moral, and spiritual well-being. *Id.* The trial court must consider the 16 factors set forth in 23 Pa.C.S. § 5328(a) to the extent the factors are relevant. *E.B. v. D.B.*, 209 A.3d 451, 468 (Pa. Super. 2019). With respect to relocation:

> [The trial] court must consider the relocation factors of Section 5337(h). If the proposed relocation will result in a change in custody, the court must also consider the custody factors in Section 5328(a).
>
> Several of the factors of [S]ection 5337(h) are encompassed, either directly or implicitly, by the custody factors of [S]ection 5328(a). A court should avoid dissociating the issue of primary custody from the issue of relocation, and should instead decide the two issues together under a single umbrella of best interests of the children.

*S.S. v. K.F.*, 189 A.3d 1093, 1098 (Pa. Super. 2018) (cleaned up).

The trial court must "delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S. § 5323(d). However, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *A.V. v. S.T.*, 87 A.3d 818, 823 (Pa. Super. 2014) (citation omitted). "It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *Id.* (citation omitted).

Here, the trial court awarded shared physical custody to Mother and Paternal Grandmother, with Father having "partial physical custody, supervised by Paternal Grandmother during her periods of physical custody."

Custody Order at ¶ 9. Nonetheless, Mother assails the Custody Order. Mother faults the trial court's consideration of Child's safety, claiming the court disregarded Kayden's Law and "Father's criminal record—cruelty to animals and aggravated cruelty to animals—and violent behavior." Mother's Brief at 12. Mother never raised these concerns with the trial court. Even if she had, the record disproves such claims. The trial court expressed "concerns for the safety of [C]hild," confirmed that it "was well aware" of the law, and explained that it "complied with the substance of Kayden's Law by limiting [Father] to only supervised partial physical custody." Findings of Fact at 3; TCO at 10-11.

Mother further claims that "to the extent the trial court did consider the [custody] factors, [it] did so in a cursory manner without reference to the record and without an explanation for its conclusions." Mother's Brief at 13. This claim lacks merit. The record demonstrates the court's awareness of the custody factors throughout the proceedings. When it issued the Custody Order, the court included an analysis of "the custody factors as well as the relocation factors." Conclusions of Law at 3; **see generally id.** at 3-13 (trial court's analysis of the 16 custody and 10 relocation factors). The trial court's analysis was proper. **A.V.**, 87 A.3d at 823 (stating there is no required amount of detail for the trial court's explanation of its analysis).

Mother additionally complains that the trial court "made findings regarding CYS involvement, dependency cases, the parties' criminal records and protection orders without competent evidence of the record and by relying

on evidence outside the record." Mother's Brief at 14. Much of this information is in the record because Mother raised it in her pleadings. Also, Mother did not object when the matters were raised by Father, Paternal Grandmother and the GAL. It appears that the trial court presided over the Mercer County dependency and protection from abuse actions, but even if it did not, a court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Pa.R.E. 201(b)(1)-(2); *id.* at (c)(1), (d) (providing a trial court "may take judicial notice on its own … at any stage of the proceeding").

Curiously, Mother raises multiple grievances, but does not articulate a desired outcome beyond "remand … for further proceedings."[11] Mother's Brief at 59. When the trial court asked Mother what she wanted "to see happen," she said that she wanted to move to Ohio with Child, and would be willing to "work out some kind of visitation schedule." N.T., 11/27/24, at 41-42. Mother stated she "would be more open" to visitation every other weekend, and Paternal Grandmother "could have [Child] for a week or so. I would be more

---

[11] A party may petition to modify custody at any time. *J.P. v. J.S.*, 214 A.3d 1284, 1290 (Pa. Super. 2019). Thus, a custody order is not permanent "regardless of whether the order is styled as interim or final." *J.M. v. K.W.*, 164 A.3d 1260, 1268 (Pa. Super. 2017); *see generally Kassam v. Kassam*, 811 A.2d 1023, 1024-28 (Pa. Super. 2002) (stating the designation of a custody order as "interim" or "final" relates primarily to the appealability of the order).

willing to do that with her and communicate directly with her through it." ***Id.*** at 43. Mother also stated that if she was not permitted to relocate, she "would still do one week on, one week off[,] with the exchanges done by [Paternal Grandmother]." ***Id.*** at 51. For the most part, the trial court granted Mother's requests. The record supports the court's statement that it "proceeded in a manner which it determined would assist the [c]ourt in reaching a just disposition of the matters before it." TCO at 12. The record further reflects the court's exercise of discretion and forbearance.

For the reasons discussed above, we affirm the order granting Paternal Grandmother's petition to intervene, and the Custody Order granting Mother permission to relocate, with Mother and Paternal Grandmother sharing physical custody, and Father having physical custody supervised by Paternal Grandmother.

Orders affirmed.

Judge Lane joins this memorandum.

Judge McLaughlin concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 08/21/2025